**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.** 20-mj-3347-McAliley

**UNITED STATES OF AMERICA**

**v.**

**JANCER SERGIO RAMOS VALDES,**
**a/k/a "Hansel,"**

**Defendant.**

_______________________________________/

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? ______ Yes ___X___ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? ______ Yes ___X___ No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? ______ Yes ___X___ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: ______________________________

Quinshawna S. Landon
Assistant United States Attorney
Fla. Bar No. 99835
99 Northeast 4th Street
Miami, FL. 33132-2111
Tel: (305) 961-9632
Fax: (305) 530-7976
Quinshawna.Landon@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Jancer Sergio Ramos Valdes,<br>a/k/a "Hansel"<br>*Defendant(s)* | Case No. 20-mj-3347-McAliley |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 4, 2019 - January 20, 2019 in the county of Miami-Dade in the Southern District of Florida, and elsewhere, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 8 U.S.C. §§ 1324(a)(1)(A)(iv); 1324(a)(1)(B)(i); and 1324(a)(1)(A)(V)(I) | Conspiracy to encourage and induce aliens to enter the United States for financial gain and encouraging and inducing aliens to enter the United States for financial gain |
| 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(2)(B)(ii) | Conspiracy to bring an alien into the United States and bringing an alien into the United States for financial gain |
| 18 U.S.C. § 1201(a)(1) and 1201(c) | Conspiracy to commit kidnapping and kidnapping |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

SA Aaron D. Spielvogel, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Face Time (specify reliable electronic means)

Date: August 10, 2020

Chris McAliley
*Judge's signature*

City and state: Miami, Florida

Hon. Chris M. McAliley, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Aaron D. Spielvogel, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2016. I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA") Task Force, in the FBI Miami Division, where I am responsible for conducting investigations of transnational organized crime, regarding violations of federal laws, particularly those laws found in Titles 8, 18, 19 and 21 of the United States Code. My duties include investigating violent crimes that involve human smuggling, kidnapping, and extortion, among other crimes. I am, therefore, an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, which empowers me to conduct investigations of, and make arrests for, violations of Title 18 of the United States Code.

2. This Affidavit is submitted for the limited purpose of establishing probable cause that Jancer Sergio Ramos Valdes ("VALDES") did knowingly and intentionally:

a. Conspire to encourage and induce aliens to enter the United States for financial gain, in violation of Title 8, United States Code, Section 1324(a)(l)(A)(iv) and 1324(a)(1)(B)(i), all in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I);

b. Encourage and induce aliens to enter the United States for financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv);

c. Conspire to bring aliens into the United States for financial gain, in violation of Title 18, United States Code, Section 371;

d. Bring aliens into the United States for financial gain, in violation of Title 18, United States Code, Section 1324(a)(2)(B)(ii);

e. Conspire to commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201(c), in violation of Title 18, United States Code, Section 1201(c); and

f. Commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201(c), in violation of Title 18, United States Code, Section 1201(a)(1).

3. The statements contained in this Affidavit are based on my personal knowledge, as well as information provided to me by other law enforcement officers, including those based in Mexico, law enforcement support personnel, and civilian witnesses. Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint, it does not include every fact known to me in connection with this investigation. I have only set forth the facts that I believe are necessary to establish probable cause for the offenses described in this Affidavit.

## PROBABLE CAUSE

4. In or around January 2019, a group of Cuban males (hereinafter called the "VICTIMS") boarded a go-fast style boat in Bahía Honda, Cuba, believing that they were going to be smuggled into the United States.

5. On or about January 6, 2019, the VICTIMS arrived in the vicinity of Progreso, Mexico. An individual named "Hansel," later identified as VALDES, and CO-CONSPIRATOR 1 met the VICTIMS when they reached the shore and transported them to a house located at or near Merida, Mexico.

6. Once the VICTIMS arrived at the house, VALDES and CO-CONSPIRATOR 1 directed the VICTIMS to remove their clothing and locked them in a room. The next day, VALDES and CO-CONSPIRATOR 1 returned to the house. CO-CONSPIRATOR 2 also arrived. VALDES commanded the VICTIMS to provide contact information for a family member who could pay a fee of $10,000 United States Dollars ("USD") for their release. The kidnappers threatened to beat, disfigure and/or starve the VICTIMS if they did not receive the money.

7. The kidnappers began to call and demand money from the VICTIM's relatives, who resided, among other places, in Cuba, Miami, and Las Vegas, in exchange for the VICTIM's release. Some of the relatives advised the kidnappers that they did not have any money, while others begged for more time to gather the funds. To coerce some of the relatives into paying the fee, the kidnappers sent video recordings of the VICTIMS being shocked with a stun gun and/or beaten. The kidnappers also threatened to kill the VICTIMS if they did not receive the $10,000 USD.

8. One of the VICTIM'S relatives contacted their local authority to get assistance in negotiating the VICTIM'S release. The case was referred to the FBI in Las Vegas ("FBI LV"), who opened an investigation.

9. Meanwhile, between approximately January 7, 2019, and January 16, 2019, the kidnappers harassed and threatened the relatives in an effort to collect the money. If a relative

was able to pay the $10,000 USD ransom, the kidnappers released the respective VICTIM and sent him by bus to the Mexican-United States border with instructions to seek asylum. For those VICTIMS whose relatives could not pay the fee, they were tortured and moved to different houses while the co-conspirators continued to attempt to collect the money.

10. On or about January 16, 2019, one of the VICTIMS escaped and placed a telephone call to the Mexican authorities, informing them of the location where the VICTIMS were being held captive. The Mexican authorities rescued the remaining VICTIMS.

11. After the VICTIMS were rescued, the FBI in Miami ("FBI Miami") began an investigation, including interviewing several of the VICTIMS and witnesses and determined that after the kidnappers detained the VICTIMS in Mexico and demanded a ransom payment the following occurred:

VICTIM 1

12. When the kidnappers asked VICTIM 1 for the contact information of a relative who would pay the ransom fee, he provided his uncle's, WITNESS 1, telephone number. The kidnappers called WITNESS 1, who was located in Miami, Florida, and advised him that they were holding VICTIM 1 captive and demanded $10,000 USD for VICTIM 1's release. WITNESS 1 begged the kidnappers not to hurt his nephew and promised to pay the money.

13. WITNESS 1, in turn, called another relative, WITNESS 2, to advise him of the kidnapping and to ask for help in gathering the money. WITNESS 2 asked WITNESS 1 to provide the kidnapper with his phone number so that he could coordinate the payment. Shortly thereafter, WITNESS 2, who was located in Miami, Florida, received a telephone call via WhatsApp from Mexico. The kidnapper told WITNESS 2 that VICTIM 1 would be beaten and starved if he did not pay the ransom fee.

14. Over the course of several days, the kidnapper called WITNESS 2 multiple times to obtain the payment. On or about January 9, 2019, the kidnappers sent WITNESS 2 pictures of two passports and directed WITNESS 2 to send money via Western Union to the individuals listed in the passports. WITNESS 2 complied and made several partial payments to the kidnappers via Western Union. At one point, the kidnappers told WITNESS 2 to make a payment to a co-conspirator, who was based in Miami. The Miami-based co-conspirator contacted WITNESS 2 and arranged to meet him in Miami to collect the money. Once WITNESS 2 made the final payment of approximately $7,000 in cash, the kidnappers advised WITNESS 2 that VICTIM 1 would be released.

15. Meanwhile, while VICTIM 1 waited for his family members to pay the ransom money, he observed "CO-CONSPIRATOR 2" direct VALDES and CO-CONSPIRATOR 1 to beat the other VICTIMS and place extortion calls to several of the VICTIMS's relatives. On one occasion, VICTIM 1 witnessed VALDES and CO-CONSPIRATOR 1 tie up another VICTIM, whom he did not know and who had a medical condition, and shock him with a stun gun. The kidnappers, however, did not torture VICTIM 1.

16. VICTIM 1 also heard VALDES and CO-CONSPIRATOR 1 direct a woman to pick up the payments that the VICTIM's relatives sent via Western Union.

17. On or about January 17, 2019, the kidnappers (along with other unidentified co-conspirators) arranged and paid for VICTIM 1 and another VICTIM to travel by bus to the Mexican-United States border. An unidentified female co-conspirator met them at the bus station, pointed out the bridge to the border that was just a few feet away, and directed them to ask for political asylum.

18. VICTIM 1 did not, and knew that he did not, have prior official authorization to come to, enter, or reside in the United States.

19. As part of its investigation, FBI Miami interviewed VICTIM 1 on January 8, 2020. During the interview, VICTIM 1 reviewed a photo line-up depicting six individuals and identified VALDES as the kidnapper VICTIM 1 knew as "Hansel."

20. FBI Miami also conducted a logical extraction of WITNESS 2's cellphone. In it, FBI Miami found several WhatsApp communications between WITNESS 2 and a Mexican-based telephone number ending in -0288 that took place during the period of time that VICTIM 1 had been kidnapped. The communications included text messages and audio recorded messages (in Spanish) directing WITNESS 2 to send the ransom payments to co-conspirators via Western Union. In addition, FBI Miami discovered the passport photos that the kidnappers sent to WITNESS 2 and a screenshot of the WhatsApp profile of the Miami-based co-conspirator that included a picture.[1] Toll records also showed that WITNESS 1 received calls from a Mexican-based telephone number ending in -0288.

21. Additionally, FBI Miami served a subpoena on Western Union, which revealed that during the period of time that VICTIM 1 was held captive, WITNESS 1 and WITNESS 2 made a total of $3,050 in ransom payments through Western Union.

<u>VICTIM 2</u>

22. CO-CONSPIRATOR 2 told VICTIM 2 to contact a family member and figure out who was going to pay the ransom fee. VICTIM 2 called WITNESS 3, his father, who lives in

---

[1] Witness 2 confirmed that the WhatsApp profile picture looked like the woman who picked up the ransom money from him.

Miami, Florida. The kidnappers informed WITNESS 3 that they were holding VICTIM 2 and would kill him if he did not pay $7,000 USD.

23. WITNESS 3 put his girlfriend on the phone to help negotiate his son's release. According to WITNESS 3, his girlfriend had a contact in Cuba who had helped arrange VICTIM 2's trip to the United States. WITNESS 3 paid an initial payment of $100 but did not pay the remainder of the fee.

24. The kidnappers held VICTIM 2 for approximately ten days. During that time VICTIM 2 witnessed, and personally endured, physical abuse and torture. VICTIM 2 observed VALDES and CO-CONSPIRATOR 1 beat the other VICTIMS with paddles, shock them with stun guns, and threaten to mutilate their bodies. The kidnappers also showed the VICTIMS videos of themselves torturing other victims whom had previously been kidnapped and whom could not pay the ransom fee. VICTIM 2 recalled that in one of the videos, the kidnappers severed a victim's finger with a shovel.

25. During his time in captivity, VICTIM 2 was shocked with a stun gun and remembered VALDES telling the group that he had raped the wives of previous kidnapping victims as a form of payment. One of the kidnappers also stated that the VICTIMS's lives were only worth fifteen Mexican pesos—the price of a bullet.

26. On approximately the tenth day of VICTIM 2's captivity, he was taken to another location. The kidnappers (along with other unidentified co-conspirators) arranged and paid for VICTIM 2 and another VICTIM to travel by bus to the Mexican-United States border. An unidentified female co-conspirator met them at the bus station, pointed out the bridge to the border that was just a few feet away, and directed them to ask for political asylum.

27. VICTIM 2 did not, and knew that he did not, have prior official authorization to come to, enter, or reside in the United States.

28. As part of its investigation, FBI Miami interviewed VICTIM 2 on February 13, 2020. During the interview, VICTIM 2 reviewed a photo array depicting six individuals and identified VALDES as the kidnapper VICTIM 2 knew as "Hansel."

29. Additionally, FBI Miami served a subpoena on Western Union, which confirmed that during the period of time that VICTIM 2 was held captive, WITNESS 3 made a $100 ransom payment to the kidnappers through Western Union. Toll records also confirmed that WITNESS 3 received phone calls from a Mexican-based telephone number ending in -8266.

VICTIM 3

30. VICTIM 3 called his aunt and uncle, WITNESS 4 and WITNESS 5, respectively, who lived in Las Vegas, Nevada. WITNESS 4 and WITNESS 5, however, did not answer the phone. When the kidnappers finally reached WITNESS 4 and WITNESS 5, they handed the phone to VICTIM 3 and told him to tell his family that he would be tortured and killed if the kidnappers did not receive $10,000 USD. The kidnappers then shocked VICTIM 3, who had medical issues and wore a colostomy bag.

31. WITNESS 4 and WITNESS 5 contacted the police, who referred the matter to FBI LV. Over the next ten days, FBI LV assisted in negotiating VICTIM 3's release. On or about January 9, 2019, the FBI recorded the calls between the kidnappers and WITNESS 4. The kidnappers called from Mexican-based numbers ending in -0288 and -8286.

32. On one occasion, the kidnappers contacted VICTIM 3's aunt and uncle on a messaging application called IMO. WITNESS 4 noticed that the profile name for that application was "Jancer," VALDES's first name. During one of the recorded calls, WITNESS 4

referred to the kidnapper as "Jancer."[2] The kidnapper seemed startled at first and then denied that that was his name.

33. In other recorded calls, the kidnappers told WITNESS 4 that they would torture VICTIM 3 and deprive him of food until she paid the ransom fee. On or about January 11, 2019, FBI LV directed WITNESS 4 to make a $100 payment to the kidnappers via Western Union.

34. During the negotiation process, the kidnappers moved VICTIM 3 and some of the other VICTIMS between three different houses. The VICTIMS, including VICTIM 3, were starved, routinely beaten and shocked with stun guns, and threatened with death.

35. The kidnappers also video recorded the beatings for the purpose of extorting the VICTIMS's family members for money. For example, the kidnappers sent WITNESS 4 a series of three video recordings, in which they tortured VICTIM 3 while he was naked. In one of the recordings, the kidnappers shocked VICTIM 3 with a stun gun while his hands, feet, and mouth were bound. The kidnappers also commanded VICTIM 3 to explain that VICTIMS who did not pay the ransom were physically beaten, starved, and not given water. They also told VICTIM 3 to relay that they had not given him food or water for several days.

36. On or about January 16, 2019, one of the VICTIMS escaped from the residence and contacted the Mexican authorities to inform them of the location where the other VICTIMS were being held captive. The Mexican authorities rescued VICTIM 3, along with the remaining VICTIMS.

37. As part of its investigation, FBI LV searched Facebook for the Mexican-based number ending in -8286. The search revealed an account under the name "Compa Compa" that

[2] In the recorded call, it sounds like WITNESS 4 said "Hansel." I believe that the victims and witnesses are phonetically pronouncing "Jancer" as "Hansel."

included a profile picture. FBI LV advised the Mexican authorities about the account. The Mexican authorities also conducted the search, found the same account, and took a screen shot of the account. I have reviewed the screen shot. The profile picture substantially matches a picture of VALDES from his United States immigration file.

38. On February 10, 2020, FBI Miami interviewed VICTIM 3. During the interview, VICTIM 3 identified VALDES as "Hansel" from a photo line-up containing the pictures of six individuals.

## CONCLUSION

39. Based upon the aforementioned information, there is probable cause to believe that VALDES did knowingly:

a. Conspire to encourage and induce an alien to enter the United States, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(iv) and 1324(a)(1)(b)(i), all in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I);

b. Encourage and induce and alien to enter the United States, in violation of Title 18, United States Code, Section 1324(a)(1)(A)(iv);

c. Conspire to bring an alien into the United States for financial gain, in violation of Title 18, United States Code, Section 371;

d. Bring an alien into the United States for financial gain, in violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii);

e. Conspire to commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United

States Code, Section 1201(c), in violation of Title 18, United States Code, Section 1201(a)(1); and

f. Commit kidnapping by using the mail and any means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, in violation of Title 18, United States Code, Section 1201(c), in violation of Title 18, United States Code, Section 1201.

**.FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Aaron D. Spielvogel
Special Agent
Federal Bureau of Investigation

Attested to by the Applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Face Time this 10th th day of August, 2020, in Miami, Florida.

Chris McAliley
HONORABLE CHRIS M. McALILEY
UNITED STATES MAGISTRATE JUDGE