**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 21-20050-CR-ALTONAGA(s)**

**UNITED STATES OF AMERICA,**

**v.**

**JANCER SERGIO RAMOS VALDES, et al.,**

**Defendants.**
**_________________________________________/**

## UNITED STATES OF AMERICA'S RESPONSE TO DEFENDANT'S OBJECTION TO DIRECT, INEXTRICABLY INTERTWINED AND RULE 404(B) EVIDENCE

The United States, by and through the undersigned Assistant United States Attorney, files this Response to Defendant Jancer Sergio Ramos Valdes' ("Valdes") Objection to Introduction of Evidence [ECF No. 128]. Because the evidence which Valdes seeks to exclude is *res gestae* of the charged offenses or inextricably intertwined, the requested relief of exclusion should be denied. Alternatively, even if the contested evidence is reviewed under Rule 404(b), it remains proper for admission at trial.

## FACTUAL BACKGROUND

The Superseding Indictment charges the Defendants with offenses resulting from their migrant smuggling and ransom operation. The charged crimes address the Defendants and unidentified associates moving migrants to generate smuggling and ransom proceeds. The geographic scope of the collection of migrants ranged from the coasts of Cuba and transport them to locations in Mexico's Yucatan Peninsula. Once migrants arrived in Mexico, they were typically required to satisfy a smuggling debt of $10,000.[1] The evidence of the scheme's operation includes

[1] *See for e.g.*, United States Production 1, Advance Jencks, BSN0032, BSN00335, BSN00338, BSN00340, BSN00480, BSN00517, BSN00608, BSN00694, BSN00719-720, BSN00722, BSN04382, BSN04384, BSN04387.

collaboration with violent criminal organizations, corrupt officials, and money launderers to preparate a multinational enterprise. *See for e.g.* Cellular Phone Extraction, 1B118_LG_K50S, BSN20249, August 23, 2020 (Defendants Vidal and Marquez addressing interaction with a drug cartel (Spanish text: “A ese [Spanish expletive] de javier no ables nada q teng. Ver con el cartel”; English text translation: Don't say anything to that [expletive] Javier. See with the cartel”)); (addressing use of police to secure money (Spanish text: Q ya hablamos y hay q darle un dinero al jefe de la policía de aquí; English text translation: “We already talked and we have to give some money to the police chief here”)); *see also* Reynaldo Abreu Garcia Statement Translation Transcript[2], BSN20482, Page 41 (Abreu: “I am in Cancun, but I know about all these [UI] Do you understand what it is like? They have made a few trips, and I am telling you, because I have friends of mine who work with...in the cartel. Do you understand what I mean?” Agent: “Which cartel?” Abreu: “The one from Jalisco.”); *id. at* BSN20588, Page 147 (Agent: “Do you have to pay the cartels to bring in the Cubans?” Abreu: “What do you mean?” Agent: Do you have to pay like a kickback to them like a...? Abreu: “You have to pay them.” Agent: “How much is it?” Abreu: “You have to pay them... well... for each trip you have to give them around twenty thousand dollars.” Agent: “Per boat or per trip?” Abreu: “Per trip.”); s*ee also* Yohismy Perez Gonzalez Statement Translation Transcript, BSN20408-09, Page 86-87 (“Agent: There's always a boss in the plaza who has to be paid to operate. OK. Do you know if... José Miguel had to pay someone for... every time he brought a trip? YPG: No. Agent: No. You don't know. YPG: I don't know if to the cartel, I think so… Agent: What we do know about Mexico is... who controls Mexico? The cartels. YPG: The cartel had to be paid. Agent: So, the cartel has its zone. Agent: Which cartel had to be paid? YPG: I don't know if it was the Gulf cartel or the cartel of... the New Generation one,

[2] The trial transcripts and translations of Defendants’ statements to law enforcement will be redacted in compliance with *Bruton v. United States*, 391 U.S. 123 (1968).

but those people, yes....”); *id*. at BSN20411-12, Page 89-90 (“Agent: Did Jose have people in the police that could... that would tell him when they were going to do raids? YPG: In Mexico? Agent: Yes. YPG: Sure, man; that's all paid for. Agent: You... which... And was it the police of... of the state or was it the police?... YPG: State Agent: Do you know them?... YPG: No, no, no. Agent: Do you know how much they paid him? YPG: No, sometimes I think he used to give him ten thousand pesos to take care of the staff.”).

A core facet of the conspiracy centered on how to resolve the challenge of unpaid smuggling debts. As the initial phase of the conspiracy, victim family members were contacted once confederates had arrived at their safehouses. *See* Yohismy Perez Gonzalez Statement Translation Transcript, BSN20348-49, Page 26-27 (YPG: “My job was... I would make phone calls and that's it, and...”; Agent: And how did those call go? What did you say?; YPG: Nothing, 'hey, here is your relative, your son, your brother, your nephew, uh... come on, pay up’. Stuff like that.”); *id*. at BSN 20352, Page 30 (“YPG: There were times when they craned their necks like this so that they could listen... there were times when they sent video; Agent: And obviously you were there, you were watching all that; YPG: Yes, but I didn’t... take part in the beatings, or the video, or the abuse....; Agent: When you say that he would slap someone, who was beating then?; YPG: Him; Agent: Who?; YPG: Jose, Chupa.”); *see also for e.g.*, extortionate communications from telephone number associated with Defendant Lemus.[3]

As Valdes and other confederates have acknowledged, victims who would not, or could not pay, were caged and subjected to an array of abuses. *See* Yohismy Perez Gonzalez Statement

---

[3] *See for e.g.*, Extortionate phone calls reflected on T-Mobile Phone Records BSN14315-14320, Phone calls made from March 9, 2018 through March 16, 2018. See also, Extortionate phone call reflected on T-Mobile Phone Records BSN14063-14255 from May 24, 2018 through May 29, 2018. *See also*, Extortionate phone call reflected on AT&T Phone Records BSN15312-15727 20312-20313 on May 16, 2018. *See also* phone calls reflected on AT&T Phone Records BSN14899-15231, 20314-20318 on February 20, 2018.

Translation Transcript, BSN20397, Page 75 ("Agent: And who did they put behind bars? YPG: That's where they put those who couldn't pay."); *id*. at BSN20412, Page 90 ("Agent: Also, during the time that the emigrants were there in the house, if... if someone didn't pay, how long did they stay there waiting for payment? Like more than how long. YPG: About a month, easy. Agent: A month, easy. There in that dungeon. YPG: Yes."); *id.* at BSN20389-90, Page 67-28 ("Agent: We know that people got beat there. Who beat people in the house? We know that people were beat. Who beat people? YPG: That one was a beater. The other two as well. . . Jancer and Tony. Uh... . . . Jose beat people. . . .; Agent: And electricity, did they do shocks too?; YPG: Sometimes. Not always. Agent: But they did. YPG: Yes, yes, yes. Agent: And the paddles?... YPG: With one of those Mexican boards that they give in Mexico over there. A board."); *id*. at 20391, Page 69 (addressing sexual encounters with migrants smuggled by the organization: "Agent: Did you ever... did you ever sleep with a woman?; YPG: No; Agent: Niño? Chupa? Jancer? Tonito?; YPG: They did. But I didn't."); *see also* Reynaldo Abreu Garcia Statement Translation Transcript, Translation Transcript, BSN20558, Page 117 (Addressing business relationship with defendants Vidal, Ramos and a third associate: "I had a deal... I... not a business deal...uh, no friendship either, we made a business deal, no, with them. What happened, those people were very abusive...."); *id*. at BSN20559, Page 118 ("The same people that I brought up told me... told me, 'damn bro, the way you treat people [UI] from those others'."); *id*. at BSN20568, Page 127 (Abreu: "No, no. I don't deny it brother because at the end eh... we are living from the migrants. I was an emigrant too."). The Defendants' abuses on the victims varied from violence to induce the payment of ransom, to generating labor and sexual benefits for conspirators.[4] Not only did the organization

[4] *See*, *e.g.*, United States Production 1, Advance Jencks, BSN00335, BSN00539 (for example of threats to starve or dehydrate), BSN00721 (describing a victim experience of being forced to watch a video of migrants having their fingers severed with a shovel), BSN 00139 (video of a migrant being struck while disrobed), BSN00329, BSN00613, BSN00731 (noting that migrants were threatened that if they spoke of their ordeals, the conspirators would find them

use electric shock devices and wooden bats or paddles to beat and torture the victims to extract ransom payments, the organization had firearms at the safehouses. *See* Yohismy Perez Gonzalez Statement Translation Transcript, BSN20425-20426, Pages 103-104 ("Agent: There were guns there? YPG: They bought a little gun. Agent: To keep in the house. YPG: Yes, a gun. Agent: Do you know if the people who were guarding the house had a gun? YPG: I tell you, there was a gun. He had his, because of his deals, his things. Agent: Who is 'He', Jose Miguel? YPG: Jose, yes.").

In several instances, the organization lied to the migrants to induce them to board the vessels, such as telling them they were directly going to the United States, or lying about the smuggling debts, in order to get them on the vessel to Mexico and confine them for payment, labor, or sexual benefits for conspirators. *See* BSN20248; Sony_Xperia, Reynaldo Abreu Garcia Phone Extraction, WhatsApp Conversation with Unindicted Co-Conspirator "Mercy" ("UCC") (UCC: So what price do we agree on? RAG: 10000 to the border. USA UCC: OK, and up to Mexico?; ??; RAG: Up to here. 7000. UCC: A yaa. RAG: why? UCC: Because there are two girls that can only pay 4000 each one and I said no. What do we do? RAG: Get them in and they'll pay when they get here. No worries. UCC: are you sure? RAG: No worries. I'll make them pole dance if not. UCC: That's the best. OK with me. Another thing. Me and my little buddy can stay and work there with you? RAG: Of course.).

---

and their family members through associates in Cuba and the United States), BSN00480, BSN00721 (for example of a threat to mutilate), BSN00722, BSN00733, BSN04388 (for example of a threat to sexually assault), BSN00733 (for threatened peonage to a sexual entertainment venue); BSN00340, BSN00608, BSN00721, BSN04387 (for example of battery), BSN00341, BSN00539, BSN00608, BSN00721, BSN04387 (for example of electrocution), BSN00480 (for example of threatened suffocation), BSN00517, BSN04384 (for threatened homicide).

## ARGUMENT

### A. Scheme Violence and Exploitation Are Direct or Inextricably Intertwined Evidence of the Charged Conduct

Valdes improperly seeks to exclude the direct evidence of his crimes. The suffering endured by victims was part of a plan to use violence and exploitation to induce ransom payments. In sum, pain was the point. Moreover, the contested evidence also constitutes direct evidence of victims' lack of consent to their detentions and the Defendants' motivation to secure a benefit, core facets of the kidnapping charges. *United States v. Lewis*, 115 F.3d 1531, 1535 (11th Cir. 1997) (noting the elements of the crime of kidnapping under 18 U.S.C. § 1201 require proof of an "unconsenting" person); *United States v. Duncan*, 855 F.2d 1528, 1536 (11th Cir. 1988) ("The motivation of rape is admissible to show that the defendant kidnapped for a benefit, a required element of a § 1201 offense."); *see United States v. Van Metre*, 150 F.3d 339, 350 (4th Cir. 1998) ("One way for the government to satisfy this specific intent requirement was to prove that Van Metre's purpose in abducting Blake was, from the very start, for his own sexual gratification."). Accordingly, Valdes' and his confederates violence and exploitation are not extrinsic, but rather part of the charged offenses' *res gestae*.

"Relevant direct evidence of a crime charged is always admissible unless it falls under a rule of exclusion." *United States v. Troya*, 733 F.3d 1125, 1131 (11th Cir. 2013) *cert. denied sub nom. Sanchez v. United States*, 135 S. Ct. 2048 (2015) and cert. denied, 135 S. Ct. 2048 (2015); *see also United States v. Eppolito,* 543 F.3d 25, 47 (2d Cir. 2008) (Noting that where the indictment contains a conspiracy charge, "uncharged acts may be admissible as direct evidence of the conspiracy itself."); *see also United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011) (noting that "the government in a conspiracy case may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment.").

Because the Defendant's violent and exploitative tactics bear on direct proof of the charged crimes, their evidence is relevant, admissible and not "other act" evidence subject to Rule 404(b). *See United States v. Brady,* 26 F.3d 282, 287 (2d Cir. 1994); *see also United States v. Delva*, 858 F.3d 135, 156 (2d Cir. 2017) ("Delva was charged not only with the substantive offenses of kidnapping and robbery but also with conspiring to commit those offenses; the court concluded that the rape evidence was relevant and, given the circumstances of the crimes, was not unfairly prejudicial."); *see also United States v. Birtha*, 384 F. App'x 351 (2010) (evidence of sexual assault committed during home invasion not more prejudicial than probative where it completed the story of the crime and was inextricably intertwined with it, and also cut against the defense that "there was little physical evidence linking [the defendant] to the home invasions, that the robbery victims were unable to identify him, and that the testimony of cooperating co-conspirators was not credible"); *see also United States v. Rivera*, 83 F.3d 542 (1st Cir. 1996) (evidence of sexual assault committed during kidnapping not more prejudicial than probative where it provided the sole direct evidence of use of a firearm, which was at issue); *see also United States v. Mayhew*, 380 F. Supp. 2d 915, 935 (S.D. Ohio 2005) ("The killings of Frank Rigsby and Tamara McKibben were intrinsic acts that were 'inextricably intertwined" with the alleged kidnaping. Thus, they need not be analyzed under Rule 404(b) and are admissible as integral parts of the charged kidnaping offense.").

Additionally, the violent and exploitative acts used to yield befits for the Defendants' aids to "complete the story of the crime . . . [or] . . . [is] inextricably intertwined with the evidence regarding the charged offense." *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007); *see also United States v. Baker*, 432 F.3d 1189, 1205 n. 9. (11th Cir.2005) ("This so-called 'res gestae' often arises during trials for conspiracies where the 'other crimes, wrongs, or acts' describe

the co-conspirators' behavior within the scope and in furtherance of the charged conspiracy.”). The Defendants’ use of violence in is not extrinsic to their kidnapping, extortion, and smuggling of the migrants, and should not be treated as 404(b) evidence. *See United States v. Gay*, 423 Fed. Appx. 873, 876 (11th Cir. 2011) (“In this case, the district court did not abuse its discretion by admitting Norrington’s testimony concerning Gay’s participation in a robbery crew, or the evidence about Gay's parolee status, as both were inextricably intertwined with evidence concerning the charged offense.”); *see also United States v. Cody*, 460 Fed. Appx. 825, 827 (11th Cir. 2012) (“The limitations of Rule 404(b) apply to evidence of conduct which is ‘extrinsic’ to the crime charged, but not to evidence of criminal or wrongful behavior that (1) arose out of the same transaction or series of transactions as the charged offense; (2) is necessary to complete the story of the crime; or (3) is “inextricably intertwined” with the charged offense . . . If evidence is not extrinsic under Rule 404(b), then notice is not required.”) (*citing United States v. Leavitt*, 878 F.2d 1329, 1339 (11th Cir. 1989); *see also United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004) (“We conclude that each action was ‘inextricably intertwined’ with the conspiracy, and therefore not subject to Rule 404(b), because each occurred within the temporal scope of the conspiracy and comprised the conspiracy.”).

In *United States v. Almeida*, 379 F. App'x 919 (11th Cir. 2010), the Eleventh Circuit upheld the entry of co-conspirator testimony regarding about an alien smuggling operation “that occurred only months prior to the charged alien smuggling operation.” *Id*. at 922. The Eleventh Circuit held that the “earlier smuggling trip was similar in all material respects given that it: (1) involved the same conspirators, including these four defendants, performing the same roles in the operation; (2) used the same Fort Myers beach house; (3) involved two boats, with one making the trip to Cuba and the other meeting up with it in open water for refueling and to transfer some aliens; (4)

involved patrols of the waters outside the Fort Myers beach house on jet ski; and (5) was done for financial gain." *Id*. at 922-923. Thus, the co-conspirator testimony "was extrinsic evidence "inextricably intertwined" with the evidence of the charged offense that provided context, motive and setup of the charged offense." *Id*. at 923, citing *United States v. U.S. Infrastructure, Inc.*, 576 F.3d 1195, 1210 (11th Cir.2009), cert. denied, —— U.S. ——, 130 S.Ct. 1918, 176 L.Ed.2d 368 (2010). The Eleventh Circuit also noted that the testimony was "properly admitted under Federal Rule of Evidence 404(b) to show motive, preparation and knowledge, as well as an ongoing alien smuggling scheme." *Id*., citing *United States v. Perez*, 443 F.3d 772, 779 (11th Cir. 2006).

Additionally in *Gay*, the Eleventh Circuit upheld the entry of testimony regarding the uncharged commission of "twenty robberies from 2006 through 2008." *Gay*, 423 Fed. Appx. at 876. At the time, Gay had been charged with one September 16, 2008 robbery. *Id.*; *see also United States v. Proctor*, 861 F. App'x 760, 768 (11th Cir. 2021) ("The carjacking that occurred before the Cricket Wireless robbery and the three robberies that occurred after the Subway robbery were admissible as inextricably intertwined with the charged offenses because they arose out of the same series of transactions as the charged robberies."); *see also United States v. Jubiel*, 377 Fed. Appx. 925, 930-31 (11th Cir. 2010) (finding commission of prior "robberies was inextricably intertwined with the testimony regarding how the investigation" unfolded); *see also United States v. Smith*, 122 F.3d 1355, 1360 (11th Cir. 1997) (evidence of uncharged bank robbery was admissible as "inextricably intertwined" in trial of another bank robbery where there were "strong links" between the two robberies and they involved "similar modus operandi").

Here, the proposed inextricably intertwined evidence explains the tactics the Defendants used over multiple episodes. The Defendants' purposeful association with the group and its activities constitutes circumstantial evidence of his agreement to join the charged crimes

conspiracy. "The government may rely solely on circumstantial evidence to prove the conspiracy's existence and [a defendant's] knowing and voluntary participation." *United States v. Augustin*, 628 F. App'x 720, (Mem)-721 (11th Cir. 2016) citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942) ("Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.'") (citation omitted). "Direct evidence of an agreement to join a criminal conspiracy is rare, so a defendant's assent can be inferred from acts furthering the conspiracy's purpose." *United States v. Mulherin*, 710 F.2d 731, 738 (11th Cir. 1983).

The proposed exclusion of direct and inextricably evidence, is an "extraordinary remedy, which should be used only sparingly." *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006). Evidence of the episodes in the scheme should not be excluded given their highly probative value to proving willful association with coconspirators. Accordingly, Valdes' effort to exclude the inner workings and tactics of the operation is without merit and should be denied.

**B. <u>Alternatively, the Proffered Rule 404(b) Evidence is Admissible to Address Questions at Issue</u>**

In order to be admissible, evidence offered pursuant to Rule 404(b) must satisfy a three-part test: (1) the evidence must be relevant to an issue other than the defendant's character; (2) there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act; and (3) the evidence must pass the Rule 403 balancing test. *United States v. Breitweiser*, 357 F.3d 1249, 1254 (11th Cir. 2004); *United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir.1992) (en banc). Rule 404(b) evidence is not limited to criminal convictions, but can consist of uncharged crimes, wrongs, or other acts. Indeed, evidence of an act for which a defendant was previously acquitted can be admitted under Rule 404(b). *United States v. Ozuna*, 129 F. Supp. 2d 1345, 1350 (S.D. Fl. 2001).

Under its three-part 404(b) test, the Eleventh Circuit has held that in the absence of the defendant's admission of the intent to commit an offense, such as robbery, evidence of prior convictions and analogous conduct to the acts alleged in an indictment are admissible pursuant to Rule 404(b). *United States v. Neufeld*, 154 Fed. Appx. 813 (11th Cir. 2005), quoting *United States v. Calderon*, 127 F.3d 1314, 1332 (11th Cir. 1997) ("Ample precedent exists in this circuit finding that a not guilty plea in a drug conspiracy case, such as we have here, makes intent a material issue and opens the door to admission of prior drug-related offenses as highly probative, and not overly prejudicial, evidence of a defendant's intent."); *United States v. Dorta*, 157 Fed. Appx. 197, 199-200 (11th Cir. 2005) (finding trial court did not abuse its discretion in admitting evidence of defendant's other criminal acts of home invasion robbery and attempted bank burglary to prove knowledge and intent in prosecution for drug and robbery conspiracy and weapons offenses); *see also United States v. Barnes*, 469 Fed. Appx. 733, 736 (11th Cir. 2012) (upholding admission of defendant's statement calming to have participated in prior unrelated robbery as 404(b) evidence in a prosecution for firearm possession by a convicted felon); *see also United States v. Gay*, 423 Fed. Appx. 873, 876 (11th Cir. 2011) (approving admission of prior robbery conviction as 404(b) evidence in bank robbery prosecution).

Viewing the violent and exploitative acts under Rule 404(b), the events are alternatively evidence of the motive and intent to commit the charged conspiracies and substantive violations. The repeated efforts to work with the same group, to commit an analogous commercial violent crime aids in establishing that intention to commit the charged crimes. Further, the fact that violent and exploitative acts are removed from the crimes charged in the indictment, rather they occur before, during, and afterward in a continuous stream of crime. *See United States v. Matthews*, 431 F.3d 1296 (11th Cir. 2005) (upholding admission of 8-year-old drug-related arrest in drug

conspiracy case); *United States v. Lampley*, 68 F.3d 1296, 1300 (11th Cir. 1995) (upholding admission of 15-year-old prior bad acts). Here the proposed 404(b) evidence addresses similar intent and motive to the charges for the defendant. Moreover, the proposed 404(b) is probative to negate any defense of lack of knowledge or intent by the Defendants.

To satisfy the second prong of the test, which requires sufficient proof such that a jury could find that the Defendant committed the extrinsic acts, the government would offer witness testimony and the associated evidence. *United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir.1998) (per curiam); *see also United States v. Canton*, 294 Fed. Appx. 490, 495-96 (11th Cir. 2008) (the testimonial and physical evidence admitted by the district court was sufficient to meet the second prong of the Rule 404(b) test).

Finally, as for the Rule 403 balancing test on the issue of intent, the Eleventh Circuit has noted that "[a] defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent ...." *Zapata*, 139 F. 3d at 1358; *see also United States v. Lecroy*, 402 Fed. Appx. 440, 443 (11th Cir. 2010) ("The government was entitled to use Rule 404(b) evidence to meet its burden of proof because Lecroy did not take affirmative steps to remove intent or knowledge as issues.").

The probative value of the government's proffered evidence of the Defendant's prior conduct, acts and association with conspirators is not substantially outweighed by the risk of unfair prejudice. The evidence bears sufficient similarity to the facts charged to make it relevant, it is probative to motive, opportunity, lack of mistake and relates to events that are not remote in time to the charged conduct. *See United States v. Jernigan*, 341 F.3d 1273, 1282 (11th Cir. 2003). Moreover, a limiting instruction regarding will mitigate any potential prejudicial effect from the evidence. *See Diaz-Lizaraza*, 981 F.2d at 1225; *Penry v. Johnson*, 532 U.S. 782, 799 (2001).

"Rule 404(b) is a rule of inclusion, and that accordingly 404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case." *Jernigan*, 341 F. 3d 1273, 1280 (11th Cir. 2003). The proposed 404(b) evidence will be critical to the government's case as to the intent elements of the charges. Given the government's need to establish intent, the probative value of the proposed 404(b) evidence outweighs any prejudicial effect. Simply put, "[a] defendant who enters a not guilty plea makes intent a material issue, ... the government may meet this burden with qualifying 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue." *United States v. James*, 147 Fed. Appx. 76, 80 (11th Cir. 2005) (quoting *United States v. Delgado,* 56 F.3d 1357, 1365 (11th Cir. 1995) (as the *James* Court makes clear: "By entering a plea of not guilty to the drug trafficking and firearm possession charges, James forced the government to prove the elements of the charged offenses, which included that he had the requisite intent."); *see also United States v. Rodriguez,* 452 F. App'x 883, 887 (11th Cir. 2012) ("To prove intent the Government was permitted to submit evidence that Lorenzo Rodriguez committed similar armed robberies to steal money and drugs with the same codefendants."); *see also United States v. Allen,* 182 F. App'x 903, 912 (11th Cir. 2006) (noting in the context of a Section 1951 prosecution involving the admissibility of extrinsic robbery activity under Rule 404(b), "[w]hen a defendant charged with a conspiracy enters a plea of not guilty, he makes intent a material issue."); *see also United States v. Tucker*, 287 Fed. Appx. 77, 80-81 (11th Cir. 2008) (affirming admission of photographs under 404 analysis of defendant in possession of a firearm despite stipulations as to convicted felon status and interstate commerce elements where possession of firearm remained at issue). As such, the third prong of the test is met as well, and the noticed conduct are also alternatively admissible under Rule 404(b).

## CONCLUSION

As the direct, inextricably intertwined and Rule 404(b) is offered properly, it should be deemed admissible at trial.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

By: *_/s/_* Ignacio J. Vázquez, Jr.
Ignacio J. Vázquez, Jr.
Assistant United States Attorney
Florida Bar No. 16275
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9318
Fax: 305-536-4699
E-Mail: Ignacio.Vazquez@usdoj.gov

By: *_/s/ Manolo Reboso_*
Manolo Reboso
Assistant United States Attorney
Florida Bar No. 75397
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9091
Fax: (305) 536-4699
E-Mail: Manolo.Reboso@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 25, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/* Ignacio J. Vázquez, Jr.
Ignacio J. Vázquez, Jr.
Assistant United States Attorney

*/s/ Manolo Reboso*
Manolo Reboso
Assistant United States Attorney